**ORAL ARGUMENT SCHEDULED FOR APRIL 24, 2017**

**No. 16-1005 (and consolidated cases)**

**IN THE**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Americans for Clean Energy, et al.,
Petitioners

v.

Environmental Protection Agency,
Respondent

Petition for Review of Final Agency Action
of the Environmental Protection Agency

# Obligated Party Petitioners' Final Opening Brief Regarding EPA's Refusal to Consider the Appropriate Placement of the Compliance Obligation in the Final Rule

Samara L. Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 953-6825

Evan A. Young
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
(512) 322-2506

Shane Pennington
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
(713) 229-1340

Lisa M. Jaeger
Richard Alonso
BRACEWELL LLP
2001 M Street NW
Suite 900
Washington, DC 20036-3310
(202) 828-5800

*Counsel for Petitioner Valero Energy Corp.*

LeAnn M. Johnson
Albert Ferlo
Perkins Coie LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, DC 20005-3960
(202) 654-6209

*Counsel for Petitioners Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Specialty Products Partners, L.P., Ergon-West Virginia, Inc., Hunt Refining Company, Lion Oil Company, Placid Refining Company, U.S. Oil & Refining Co., and Wyoming Refining Company*

Thomas J. Perrelli
David W. DeBruin
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6873

*Counsel for Petitioner Monroe Energy, LLC*

Richard S. Moskowitz
American Fuel & Petrochemical Manufacturers
1667 K Street, NW
Suite 700
Washington, DC 20006
(202) 552-8474

Thomas Allen Lorenzen
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789

*Counsel for Petitioner American Fuel & Petrochemical Manufacturers*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties, Intervenors, and *Amici*

Petitioners:

| | |
|---|---|
| Case No. 16-1005 | Americans for Clean Energy; American Coalition for Ethanol; Biotechnology Innovation Organization; Growth Energy; National Corn Growers Association; National Sorghum Producers; and Renewable Fuels Association |
| Case No. 16-1044 | Monroe Energy, LLC |
| Case No. 16-1047 | American Fuel & Petrochemical Manufacturers |
| Case No. 16-1049 | Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Specialty Products Partners, L.P., Ergon-West Virginia, Inc., Hunt Refining Company, Lion Oil Company, Placid Refining Company, U.S. Oil & Refining Co., and Wyoming Refining Company (collectively "Coalition") |
| Case No. 16-1050 | American Petroleum Institute |
| Case No. 16-1053 | National Biodiesel Board |
| Case No. 16-1054 | Valero Energy Corp. |
| Case No. 16-1056 | National Farmers Union |

Respondents:

The Environmental Protection Agency ("EPA") (in Case Nos. 16-1044, 16-1047, 16-1049, 16-1053, and 16-1054) and EPA and Gina McCarthy, Administrator (in Case Nos. 16-1005, 16-1050, and 16-1056).

Intervenors:

E.I. du Pont de Nemours and Company is a Petitioner-Intervenor in Case No. 16-1005.

Alon Refining Krotz Springs, Inc.; American Fuel and Petrochemical Manufacturers; American Petroleum Institute; American Refining Group, Inc.; Calumet Specialty Products Partners, L.P.; Ergon-West Virginia, Inc.; Hunt Refining Company; Lion Oil Company; Monroe Energy, LLC; Placid Refining Company; U.S. Oil & Refining Company; Valero Energy Corporation; and Wyoming Refining Company are Respondent-Intervenors in Case Nos. 16-1005, 16-1053, and 16-1056.

American Coalition for Ethanol; Americans for Clean Energy; Biotechnology Innovation Organization; E.I. du Pont de Nemours and Company; Growth Energy; National Biodiesel Board; National Corn Growers Association; National Sorghum Producers; and Renewable Fuels Association are Respondent-Intervenors in Case Nos. 16-1044, 16-1047, 16-1049, 16-1050, and 16-1054.

*Amici* before this Court:

None.

### B. Rulings Under Review

The agency action under review is EPA's final action entitled Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015) (the "Final Rule")(JA2).

### C. Related Cases

Each of the Petitions for Review consolidated under Case No. 16-1005 is related. These cases are *Monroe Energy, LLC v. EPA*, Case No. 16-1044; *American Fuel & Petrochemical Manufacturers v. EPA*, Case No. 16-1047; *Alon Refining Krotz Springs, Inc., et al. v. EPA*, Case No. 16-1049; *American Petroleum Institute v. Gina McCarthy, et al.*, Case No. 16-1050; *National Biodiesel Board v. EPA*, Case No. 16-1053; *Valero Energy Corporation v. EPA*, Case No. 16-1054; and *National Farmers Union v. EPA, et al.*, Case No. 16-1056. The consolidated cases on review have not been reviewed by this or any other Court.

On May 5, 2016, this Court deconsolidated *Alon Refining Krotz Springs, et al. v. EPA*, Case No. 16-1052, which challenges EPA's 2010 Final Rule entitled Regulation of Fuels and Fuel Additives: Changes to Renewa-

ble Fuel Standard Program, 75 Fed. Reg. 14,670 (Mar. 26, 2010) (the "2010 Rule"), from this case. *See* Order Deconsolidating Case No. 16-1052 (Doc. No. 1611965). No. 16-1052 is currently being held in abeyance.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners provide the following:

- Alon Refining Krotz Springs, Inc. is incorporated under the laws of Delaware. Alon Refining Krotz Springs, Inc. is a refiner of petroleum products. Alon Refining Krotz Springs, Inc. is owned 100% by parent company Alon USA Energy, Inc. Alon USA Energy, Inc. is a publicly traded company.

- American Fuel & Petrochemical Manufacturers ("AFPM") is a national trade association of approximately 400 companies, including virtually all U.S. refiners and petrochemical manufacturers. AFPM has no parent companies, and no publicly held company has a 10% or greater ownership interest in AFPM. AFPM is a "trade association" within the meaning of Circuit Rule 26.1. AFPM is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its memberships.

- American Refining Group, Inc. is incorporated under the laws of Pennsylvania. American Refining Group, Inc. is a refiner of petroleum products. American Refining Group, Inc. has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

- Calumet Specialty Products Partners, L.P. is incorporated under the laws of Delaware. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products. Calumet Specialty Products Partners, L.P. has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

- Ergon-West Virginia, Inc. is incorporated under the laws of Mississippi. Ergon-West Virginia, Inc. is a refiner of petroleum products. Ergon-West Virginia, Inc. is 100% owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- Hunt Refining Company is incorporated under the laws of Delaware. Hunt Refining Company is a refiner of petroleum products. Hunt Refining Company is 100% owned by Hunt Consolidated Hydrocarbons, LLC and Hunt Consolidated, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- Lion Oil Company is incorporated under the laws of Arkansas. Lion Oil Company is a refiner of petroleum products. Lion Oil Company is 100% owned by parent company Delek US Holdings, Inc. Delek US Holdings, Inc. is a publicly traded company

- Monroe Energy, LLC is a Pennsylvania-based refiner of petroleum products and is wholly owned by Delta Air Lines, Inc., a publicly traded company.

- Placid Refining Company is a limited liability corporation under the laws of Delaware. Placid Refining Company LLC is a refiner of petroleum products. Placid Refining Company LLC has no parent company, and is owned 77% by Placid Holding Company and 23% by Rosewood Refining LLC. None of these entities is publicly traded.

- U.S. Oil & Refining Co. is incorporated under the laws of Delaware. U.S. Oil & Refining Co. is a refiner of petroleum products. U.S. Oil and Refining Co. is 100% owned by parent company, TrailStone, L.P., and no publicly held company has a 10% or greater ownership interest in it.

- Valero Energy Corporation is a Texas-based energy company incorporated under Delaware law. Valero is both the world's largest independent refiner and the nation's third-largest ethanol producer and largest renewable-diesel producer. Valero has no parent corporation and no publicly held company owns a 10% or greater interest of its stock.

- Wyoming Refining Company is a trade name for Hermes Consolidated, LLC, a limited liability company organized under the laws of Delaware. Wyoming Refining Company is a refiner of petroleum products. Hermes Consolidated, LLC

is owned 100% by Par Wyoming LLC, an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held company.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... i

CORPORATE DISCLOSURE STATEMENT .......... v

TABLE OF AUTHORITIES .......... x

GLOSSARY .......... xiii

STATEMENT WITH RESPECT TO ORAL ARGUMENT .......... 1

JURISDICTIONAL STATEMENT .......... 2

STATEMENT OF THE ISSUE .......... 3

STATUTES AND REGULATIONS .......... 4

STATEMENT OF THE CASE .......... 5

A. The RFS Program .......... 6

B. EPA's initial decision to place the compliance obligation only on refiners and importers .......... 8

C. EPA proposed annual percentage standards for 2014-2016, inviting comments on "the full range of constraints" on the renewable-fuel supply .......... 10

D. EPA refused to consider comments regarding the point of obligation but exercised its general waiver authority .......... 15

SUMMARY OF ARGUMENT .......... 18

STANDING .......... 20

ARGUMENT .......... 20

A. EPA violated its plain statutory duty to determine renewable-fuel obligations that are "applicable" to "refineries, blenders, and importers, as appropriate." .............20

B. EPA's disregard of the point of obligation is premised on an unreasonable interpretation of the statute. ........................23

C. EPA's refusal to consider the compliance point is arbitrary and capricious. ..........................................................................26

1. Petitioners' comments were not beyond the scope of the rulemaking. .......................................................................276

2. EPA's refusal to consider the point of obligation is inconsistent with the Final Rule's rationale. ......................30

3. EPA's refusal to consider the point of obligation is inconsistent with its prior findings and conclusions. .........33

CONCLUSION ........................................................................................355

CERTIFICATE OF COMPLIANCE ..........................................................377

CERTIFICATE OF SERVICE ....................................................................388

## TABLE OF AUTHORITIES*

**Page(s)**

**CASES**

*Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .......... 35

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .......... 29

*Am. Petroleum Inst. v. EPA*,
706 F.3d 474 (D.C. Cir. 2013) .......... 6, 9, 32

*Chem. Mfrs. Ass'n v. EPA*,
217 F.3d 861 (D.C. Cir. 2000) .......... 24, 35

**Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) .......... 22

*City of Arlington v. FCC*,
133 S. Ct. 1863 (2013) .......... 22

**Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .......... 28, 35

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 34

*Home Box Office, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) .......... 29

*Michigan v. EPA*,
135 S. Ct. 2699 (2015) .......... 24

*Monroe Energy, LLC v. EPA*,
750 F.3d 909 (D.C. Cir. 2014) .......... 6, 7, 11, 20, 22

**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 28, 30, 32

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
630 F.3d 145 (D.C. Cir. 2010) ........................................................ 6

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) ..........................................................21

*Pac. Nw. Newspaper Guild v. NLRB*,
877 F.2d 998 (D.C. Cir. 1989) ...................................................... 34

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014) ........................................................... 23, 25

*White Stallion Energy Ctr., LLC v. EPA*,
No. 12-1100, 2015 WL 11051103 (D.C. Cir. Dec. 15, 2015) ....................... 35

**STATUTES**

Energy Independence and Security Act of 2007, Pub. L. No.
110-140, 121 Stat. 1492 (2007) ........................................................ 6

42 U.S.C. § 7412(n)(1)(A) ............................................................. 24

42 U.S.C. § 7545(o)(2) ............................................................. 6, 23

42 U.S.C. § 7545(o)(3) ....................................... 7, 20, 21, 23, 24, 25, 26

42 U.S.C. § 7545(o)(7) ............................................................. 8, 25

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 80.1406 ................................................................ 8, 10

40 C.F.R. § 80.1427 ...................................................................... 7

**FEDERAL REGISTER**

72 Fed. Reg. 23,900 (May 1, 2007) .................................................. 8, 9

*75 Fed. Reg. 14,670 (Mar. 26, 2010) ............................ iv, 8, 9, 10, 25, 32, 33

75 Fed. Reg. 76,790 (Dec. 9, 2010) ..................................................21

78 Fed. Reg. 12,158 (Feb. 21, 2013) .................................................14

78 Fed. Reg. 49,794 (Aug. 15, 2013) ................................................ 11

*80 Fed. Reg. 33,100 (June 10, 2015) (JA102) .......................... 10, 11, 13, 27

*80 Fed. Reg. 77,420 (Dec. 14, 2015) (JA2) ......................iii, 15, 16, 17, 21, 25
26, 27, 29, 30, 31, 32, 34, 35

**OTHER AUTHORITIES**

Christopher R. Knittel et al., *The Pass-Through of RIN Prices to Wholesale and Retail Fuels under the Renewable Fuel Standard* (June 2015), *available at* http://scholar.harvard.edu/files/stock/files/pass-through_of_rin_prices_1.pdf (JA605) ..................................................13

Morgenson & Gebeloff, *Wall St. Exploits Ethanol Credits, and Prices Spike*, N.Y. Times, Sept. 15, 2013, *available at* http://www.nytimes.com/2013/09/15/business/wall-st-exploits-ethanol-credits-and-prices-spike (JA664) ................................14

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| Coalition | Petitioners in Case No. 16-1049 (Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Specialty Products Partners, L.P., Ergon-West Virginia, Inc., Hunt Refining Company, Lion Oil Company, Placid Refining Company, U.S. Oil & Refining Co., and Wyoming Refining Company) |
| EPA | Environmental Protection Agency |
| NPRM | Notice of Proposed Rulemaking |
| RFS Program | Renewable Fuel Standards Program |
| RIN | Renewable Identification Number |

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Petitioners request that the Court hear oral argument in this case, which involves numerous parties, complex issues, and agency decisions affecting not only the parties but also the entire Nation. Accordingly, Petitioners believe oral argument will assist this Court in resolving the issues presented.

## JURISDICTIONAL STATEMENT

Petitioners incorporate the Jurisdictional Statement from the Obligated Party Petitioners' Opening Brief on Cellulosic Biofuel and Biomass-Based Diesel.

## STATEMENT OF THE ISSUE

Whether remand is required because, contrary to congressional mandate, EPA refused to consider whether it placed obligations under the Renewable Fuel Standards Program on those parties "appropriate" to "ensure" that statutorily mandated fuel volumes "are met."

## STATUTES AND REGULATIONS

All pertinent statutes and regulations appear in the Addendum to this brief.

## STATEMENT OF THE CASE

The Clean Air Act's Renewable Fuel Standards Program ("RFS Program") requires EPA to set annual obligations for renewable-fuel use in the transportation-fuel industry. Congress directs EPA, when doing so, to obligate the "appropriate" parties to "ensure" that statutorily-required fuel volumes "are met." Petitioners challenge an EPA Final Rule that set annual requirements under the RFS Program, yet expressly refused to consider which parties (among refineries, importers, and blenders) it is "appropriate" to obligate.

In comments on EPA's proposed rule, Petitioners demonstrated that EPA had not obligated the appropriate parties and that misplacement of the obligation was a constraint on the renewable-fuel supply. Rather than respond, EPA declared this issue beyond the scope of the rulemaking. Simultaneously, however, EPA for the first time exercised authority to waive statutory renewable-fuel requirements after determining that domestic supply is inadequate. In making that determination, EPA conceded the existence of market dysfunctions that it previously indicated would compel examination of which parties to obligate.

Petitioners contend that the Final Rule omits a statutorily-required element that Congress established as central to the RFS Program's success,

and must therefore be remanded for EPA to consider which parties to obligate. As detailed below, EPA's refusal to do so is contrary to plain statutory language and undermines the RFS Program's purpose and structure. And given the regulatory history, the Notice of Proposed Rulemaking leading to the Final Rule, and EPA's analysis in the Final Rule, EPA's refusal to consider the issue would be arbitrary and capricious even without the plain statutory language.

### A. The RFS Program

In three prior opinions,[1] this Court detailed the history and framework of the RFS Program. Enacted in 2005 and expanded in 2007, the Program's goals include "'greater energy independence and security,'" "'increas[ing] the production of clean renewable fuels,'" and "'protect[ing] consumers . . . .'" *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 911 (D.C. Cir. 2014) (quoting Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007)). To accomplish these purposes, Congress required that "transportation fuel sold or introduced into commerce in the United States" contain annually increasing "applicable volume[s]" of renewable fuel. *See* 42 U.S.C. § 7545(o)(2)(A)-(B).

[1] *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014); *Am. Petroleum Inst. ("API") v. EPA*, 706 F.3d 474 (D.C. Cir. 2013); and *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145 (D.C. Cir. 2010).

EPA must determine and publish annual percentage standards, which represent the fraction of renewable fuel that must be contained, on average, in transportation fuel sold or introduced into commerce to "ensure[]" that the applicable statutory volumes and other requirements are met. *See id.* § 7545(o)(3)(B)(i). The annual percentage standards must satisfy three "[r]equired elements," including that they "shall . . . be applicable to refineries, blenders, and importers, as appropriate." *Id.* § 7545(o)(3)(B)(ii)(I).

Obligated parties demonstrate compliance with the annual standards by acquiring and retiring "Renewable Identification Numbers" ("RINs"), 40 C.F.R. § 80.1427, which represent a standardized measure of renewable fuel, *id.* §§ 80.1401, 80.1415. Obligated parties generally must demonstrate compliance with a given year's standards by the following March 31. *Id.* § 80.1451(a)(1). RINs generally become available when an obligated party obtains ownership of renewable fuel or when any party blends renewable fuel into transportation fuel. *See id.* § 80.1429. Once "separated" from renewable fuel, RINs may be traded in the market or used to satisfy compliance obligations. *See Monroe Energy*, 750 F.3d at 912-13. Obligated parties that cannot obtain sufficient RINs through their own actions (because they do not control whether and to what extent the nonrenewable fuel they produce is blended with renewable fuel) must buy RINs from other sources,

including other obligated parties holding excess RINs, unobligated blenders, or other third parties who buy and sell RINs. *See* 40 C.F.R. §§ 80.1425-29; *see also* Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900, 23,904 (May 1, 2007). EPA has explained that this "RIN-based trading program is [] essential [to the success] of the RFS program." *Id.* at 23,908.

Congress provided EPA with general waiver authority to set annual standards below statutorily applicable volumes if, after notice and comment, EPA determines that "implementation of the requirement[s] would severely harm the economy or environment" or "there is an inadequate domestic supply." 42 U.S.C. § 7545(o)(7)(A)(i)-(ii).

### B. EPA's initial decision to place the compliance obligation only on refiners and importers

In its 2007 regulations, EPA initially placed the compliance obligation on refiners and importers, but not blenders. 72 Fed. Reg. at 23,937. This choice was made to "minimize the number of regulated parties and keep the program simple." 75 Fed. Reg. at 14,722. Thus, while it defined the term "obligated party" to include refiners and importers, "[a] party that simply blends renewable fuel into gasoline or diesel fuel . . . is not an obligated party." 40 C.F.R. § 80.1406(a)(1). As EPA recognized, however, this choice misaligned the obligation and the means of compliance. "[T]he ac-

tions needed for compliance largely center on the production, distribution, and use of a product by parties other than refiners and importers." 72 Fed. Reg. at 23,937. Refiners and importers "do not generally produce or blend renewable fuels at their facilities." *Id.*

In its 2010 Rule, EPA acknowledged that its initial administrative-ease rationale for obligating refiners and importers, but not blenders, was "no longer valid" and that imposing the obligation on "alternative" points in the fuel-supply chain would "more evenly align a party's access to RINs with that party's [RFS Program] obligations." 75 Fed. Reg. at 14,722. Professing "continue[d] belie[f] that the market w[ould] provide opportunities for parties who are in need of RINs to acquire them from parties who have excess," *id.*, however, EPA left the compliance obligation unchanged despite the "asymmetry in incentives," *see Am. Petroleum Inst. ("API")*, 706 F.3d 474, 480 (D.C. Cir. 2013) ("EPA applies the pressure to one industry (the refiners) . . . yet it is another . . . that enjoys the requisite expertise, plant, capital and ultimate opportunity for profit. Apart from their role as captive consumers, the refiners are in no position to ensure, or even contribute to, growth in the [renewable-fuel] industry.") (citations omitted).[2] But EPA pledged to "continue to evaluate the functionality of the RIN market," and

[2] The Court's recognition that refiners cannot ensure compliance with the cellulosic biofuel mandate applies equally to other RFS biofuel mandates.

to "consider revisiting" the point of obligation—that is, EPA's decision to obligate refiners and importers, but not blenders[3]—if EPA "determine[d] that the RIN market is not operating as intended, driving up prices for obligated parties and fuel prices for consumers." 75 Fed. Reg. at 14,722.

### C. EPA proposed annual percentage standards for 2014-2016, inviting comments on "the full range of constraints" on the renewable-fuel supply.

In its June 10, 2015, Notice of Proposed Rulemaking ("NPRM"),[4] EPA proposed to exercise its general waiver authority for the first time and to set annual renewable-fuel volumes for 2014-2016 below the statutorily applicable volumes. According to EPA, "real-world limitations," such as slower-than-expected development of the cellulosic biofuel industry, lower-than-expected gasoline use, and biofuel-supply constraints, had rendered domestic supply inadequate, triggering the agency's authority to waive the statutory volumes. JA103-JA104.

Although below the statutory targets, EPA's proposed volumes "require [renewable-fuel] use at levels significantly beyond the . . . E10 blendwall." JA104. The blendwall is "an infrastructure and market-related constraint on ethanol demand" that "arises because most U.S. vehicle engines

[3] Petitioners, like EPA, refer to the effect of EPA's definition of "obligated party" in 40 C.F.R. § 80.1406 as the "point of obligation."

[4] JA102.

were not designed to handle gasoline consisting of more than 10 percent ethanol." *Monroe Energy*, 750 F.3d at 913-14.

EPA proposed "to overcome current constraints and challenges" and incentivize expanded renewable-fuel use. JA104. According to EPA, "[t]he effect of increasing RIN prices is . . . to reduce the price of more renewable-fuel intensive fuels (e.g. E85) relative to the price of fuels with a lower renewable content (e.g. E10)." Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794, 49,822 (Aug. 15, 2013). This dynamic, EPA believed, would result in greater penetration of renewable fuel.[5]

The NPRM acknowledged that when determining the degree to which "domestic supply" was "inadequate," thereby permitting waiver of the statutory volumes, EPA should consider "the full range of constraints that could result in an inadequate supply of renewable fuel to the ultimate consumers, including fuel infrastructure and other constraints." JA113. EPA invited and encouraged comments "on all aspects of this proposal" and "any aspect of this rulemaking." JA152.

[5] Under EPA's theory, higher RIN prices "should" reduce the effective cost of ethanol, thereby reducing the cost of high-ethanol fuel blends relative to E10. *See* JA121 & n.49 (citing A Preliminary Assessment of RIN Market Dynamics, RIN Prices and Their Effects, Dallas Burkholder, Office of Transp. and Air Quality, EPA (May 14, 2015)).

In response to the NPRM, over a dozen parties submitted comments urging EPA to amend the regulatory definition of "obligated party" to correct multiple systemic problems that result from imposing the obligation on refiners and importers, but not blenders. These comments demonstrate that the existing regulatory point of obligation is itself a supply constraint. *See* JA636-JA639, JA674-JA675, JA597-JA602, JA579-JA580. The administrative record supporting these comments includes reports by economic experts and an analysis by Ronald Minsk, who served as Special Assistant to the President for Energy and Environment. The record shows that the mismatch between the current compliance point and the means of compliance has hampered penetration of renewable fuels at higher levels, prevented the value of RINs from passing through to consumers in the form of relatively lower prices for high-ethanol fuel blends relative to E10, and impeded installation of infrastructure needed to blend increasing volumes of renewable fuel.

Based on his review of the data, Minsk concluded that "the RINs market is simply not functioning as it should." JA236. Specifically, "[t]he current point of obligation is a significant factor inhibiting greater amounts of E85, and perhaps biodiesel, from reaching the market due primarily to the lack of properly aligned incentives and the resulting shortfall in blend-

ing infrastructure expansion." JA239.[6] Likewise, a study by National Economic Research Associates (the "NERA Report") concluded that, "if EPA wants [the RFS program] to have any chance of meeting its original goals, it must consider changes to its design." JA637 (quoting NERA Report 16).

Additionally, economists from MIT, the University of Michigan, and Harvard released a paper demonstrating that the pass-through of RIN prices to retail customers in the form of lower E85 prices relative to E10 "is precisely estimated to be zero if one adjusts for seasonality."[7] Thus, the primary theoretical mechanism on which EPA relied to increase the renewable-fuel supply, JA121, was not functioning as EPA had intended. The economists concluded that

> [w]hile RIN prices might be passed through at some retail outlets at some times, this is not the case on average using national prices . . . . [T]he key economic mechanism to induce consumers to purchase high-renewables blends is the incentives provided by RIN prices. If the RIN price savings inherent in blends with high biofuels content are not passed on to the consumer, then this key mechanism of the RFS is not functioning properly.

---

[6] Minsk examined whether high RIN prices in early 2013 actually incentivized additional build-out of E85 infrastructure where E85 is most readily available. "Tellingly," in "the state with most stations selling E85. . . as RIN prices rose in early 2013, the number of stations selling E-85 declined." JA236.

[7] Christopher R. Knittel et al., *The Pass-Through of RIN Prices to Wholesale and Retail Fuels Under the Renewable Fuel Standard* 2 (June 2015), http://scholar.harvard.edu/files/stock/files/pass-through_of_rin_prices_1.pdf (JA605).

JA607.

EPA also received comments that the misplaced point of obligation has facilitated speculation, manipulation, and fraud in the RINs market, which—despite billions of annual transactions collectively worth billions of dollars—is essentially unregulated.[8] *E.g.*, JA663-JA665. Commenters explained that the misplaced point of obligation has created opportunities for blenders to reap windfall profits from selling RINs, rather than incentivizing increased renewable-fuel sales. JA648-JA653; JA574-JA577.[9] The Department of Energy likewise recognized that parties "generate revenue by blending renewable fuels and selling excess RINs" for "windfall profits," frustrating statutory objectives.[10]

---

[8] With significant understatement, EPA has called this a "buyer beware" market for RINs. *See, e.g.*, RIN Quality Assurance Program, 78 Fed. Reg. 12,158, 12,162 (Feb. 21, 2013). The New York Times reported that "rules that apply to almost every other market—on transparency, disclosure and position limits, for example—are not imposed on the trade of RINs." JA664 (discussing Morgenson & Gebeloff, *Wall St. Exploits Ethanol Credits, and Prices Spike*, N.Y. Times, Sept. 15, 2013, at A1, *available at* http://www.nytimes.com/2013/09/15/business/wall-st-exploits-ethanol-credits-and-prices-spike.html). Speculators unconnected to obligated parties or renewable fuel can buy and hoard RINs, and RIN prices are essentially "unbridled." *Id.* "[B]ecause the E.P.A. declines to disclose who actively trades the credits, or how much they trade," the market cannot function like other public trading markets. *Id.*

[9] One company, Murphy Oil, reported a $92.9 million profit from selling RINs. JA576.

[10] *See* JA578 (discussing Small Refinery Exemption Study, Office of Policy

Petitioners therefore identified EPA's placement of the compliance obligation as a supply constraint in 2014-2016, contributing to EPA's need for a waiver. They urged EPA to address that constraint by modifying the regulatory definition of "obligated party" to apply to blenders. JA672.

### D. EPA refused to consider comments regarding the point of obligation but exercised its general waiver authority.

In the Final Rule, EPA exercised its general waiver authority for the first time.[11] Stating that it was exercising the waiver only "to the extent necessary," JA8, EPA set annual renewable-fuel requirements below statutory volumes for 2014-2016, but at levels that reflect a "market forcing" policy and require surmounting long-recognized constraints such as the E10 blendwall, JA5.

In issuing the waiver, EPA recognized that reality had disproved its economic theory and that higher RIN prices would not necessarily drive greater renewable-fuel supply under the current Program structure. EPA acknowledged that for RINs to reduce the relative retail price of high-ethanol fuel blends, the "marketplace [must] work[] both efficiently and quickly." JA41. Yet EPA found that the marketplace was *not* working effi-

---

and Int'l Affairs, U.S. Dep't of Energy 35 (Mar. 2011)).

[11] Petitioners support EPA's exercise of the waiver and have intervened on EPA's behalf to demonstrate that the waiver was necessary and authorized. As detailed in this brief, EPA's need to waive statutory volumes highlights the illegality of EPA's refusal to consider the appropriate point of obligation.

ciently or quickly—just as the MIT, Michigan, and Harvard economists had found. As EPA explained, "the market [since 2013] was not sufficiently responsive to higher RIN prices to drive large increases in E85 sales volumes." JA41. It therefore candidly stated that "the RIN is currently an inefficient mechanism for reducing the price for higher level ethanol blends at retail, and therefore unlikely to be able to significantly impact the supply of ethanol in the United States in 2016." JA39.

In reaching that conclusion, EPA relied on an updated RIN-market analysis by EPA economist Dallas Burkholder. *See* JA41 (citing citing An Assessment of the Impact of RIN Prices on the Retail Price of E85 (Nov. 2015)). Burkholder's report explained that whether the value of RINs reduces the relative retail price of high-ethanol fuel-blends is "a significant issue, as it is one of the primary ways the RFS program can incentivize the increasing use of renewable fuels." JA805. The paper found that instead of reducing the relative price of E85 to reflect the value of RINs, as EPA had theorized, blenders and retailers that are not obligated under the RFS Program instead profit by retaining the value of the RINs. JA804, JA813.

This discussion implicated Petitioners' comments that improper placement of the compliance obligation on refiners and importers, but not blenders, was itself a constraint causing dysfunction in the RIN market and

inhibiting renewable-fuel supply, and that modifying the point of obligation would correct those problems. As Harvard economist James Stock noted, "blenders are better situated to pass the RIN subsidy for high-renewable content fuels along to the consumer than are the current obligated parties, who are further upstream." JA600, JA609.

EPA acknowledged that numerous commenters had suggested that EPA modify the point of obligation. JA13. EPA did not deny that Petitioners identified real problems associated with the current point of obligation or that salutary effects would flow from Petitioners' proposed revision to the regulatory definition of "obligated parties." In fact, the agency acknowledged that the point of obligation "can . . . play a role in improving incentives provided by the RFS program to overcome challenges that limit the potential for increased volumes of renewable fuels." JA13. In response to Petitioners' comments, however, EPA said only this:

> A number of commenters provided . . . suggestions that EPA . . . change the RFS program's point of obligation from its current focus on producers and importers of gasoline and diesel. . . . [T]hese issues are beyond the scope of this rulemaking.

JA13.

EPA claimed that "additional detailed responses" could be found in a separately docketed Response to Comments. JA65. In nearly 1,000 pages, however, EPA mustered only this response to the comments and economic

analyses regarding the point of obligation:

> In the proposed rule, EPA did not propose any changes to the definition of an obligated party, nor did we specifically seek comment on this issue. EPA received comments requesting that we change the point of obligation in the RFS program primarily from parties that are obligated under the current regulations. In response we also received comments primarily from those who did not wish to see the obligation placed on them. These comments are beyond the scope of this rulemaking. EPA's current regulations, published in March 2010, define an obligated party as any refiner that produces gasoline or diesel fuel . . . .

JA1030.

## SUMMARY OF ARGUMENT

EPA's Final Rule promulgated annual renewable-fuel requirements but refused to consider whether they were applicable to the appropriate parties, as the statute requires. *Chevron* and arbitrary-and-capricious review each requires remand for EPA to consider the point of obligation.

EPA's promulgation of the Final Rule without consideration of the appropriate parties to be obligated was contrary to plain statutory language. The statute requires EPA to set annual obligations to "ensure" that statutory requirements for renewable fuel "are met." Congress unambiguously mandated that a "required element" of these annual determinations is that the obligations "shall . . . be applicable" to "appropriate" parties. EPA contravened its statutory duty by refusing to address comments demonstrating that EPA failed to obligate appropriate parties and by failing to

consider this issue in the Final Rule.

Even if the statute were less clear, no reasonable interpretation could support EPA's position that the question of who should be obligated was irrelevant to the underlying rulemaking. That interpretation is inconsistent with the statute's text, purpose, and structure, as well as multiple aspects of the NPRM and the Final Rule, including EPA's exercise of general waiver authority.

Finally, EPA's refusal to respond to Petitioners' comments on the point of obligation or otherwise consider the issue renders aspects of the Final Rule arbitrary and capricious both procedurally and substantively. EPA's contention that the point of obligation was beyond the scope of the rulemaking cannot withstand scrutiny. To the contrary, this issue is squarely within EPA's statutory duty, Petitioners' comments responded directly to EPA's NPRM, and accepting those comments and supporting data would have required a change in the Final Rule. The point of obligation is not tangential to the Final Rule, but (as EPA itself has admitted) is central to how the RFS Program functions. For that and other reasons, EPA's refusal to consider whether the appropriate parties are obligated renders the Final Rule's rationale internally inconsistent—which makes it arbitrary and capricious. EPA's refusal to confront the compliance obligation contrasts starkly

with its findings and commitments in prior RFS Program rulemakings, and EPA has offered nothing to justify its very different approach today.

## STANDING

Petitioners incorporate the standing and standard-of-review discussions from Obligated Party Petitioners' Opening Brief on Cellulosic Biofuel and Biomass-Based Diesel (at 12-13). As obligated parties, Petitioners have standing. *See Monroe Energy*, 750 F.3d at 915.

## ARGUMENT

Remand is necessary because, contrary to Congress's command, EPA refused to consider whether it placed RFS Program compliance obligations on "appropriate" parties.

### A. EPA violated its plain statutory duty to determine renewable-fuel obligations that are "applicable" to "refineries, blenders, and importers, as appropriate."

Each year, EPA must "determine and publish" the annual renewable-fuel obligation that "ensures" that the applicable statutory volumes for renewable fuel "are met." 42 U.S.C. § 7545(o)(3)(B)(i). That annual determination "shall" include:

> (ii) Required elements
>
> The renewable fuel obligation determined for a calendar year under clause (i) shall—
>
> > (I) be applicable to refineries, blenders, and importers, as appropriate;

> (II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and
>
> (III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

*Id.* § 7545(o)(3)(B)(ii).

In the Final Rule, EPA acknowledged its duty to satisfy these required elements. JA93; *see also* 75 Fed. Reg. at 76,791-792. In refusing to consider Petitioners' comments regarding placement of the obligation on the appropriate parties, however, EPA effectively declared the first of the "required elements" to be "beyond the scope of th[e] rulemaking." JA13.

The statute's plain language establishes that each of the three "required elements" is mandatory. EPA recognizes, for example, that it cannot, consistent with subparagraph (B)(ii)(III), promulgate percentage standards that do *not* consist of a "single annual standard." JA93. It obviously could not avoid that requirement by declaring it to be "beyond the scope of th[e] rulemaking." Nor does anything in the statute allow EPA to disregard another required element—EPA's duty under subparagraph (B)(ii)(I) to obligate parties "as appropriate." *See New York v. EPA*, 413 F.3d 3, 41 (D.C. Cir. 2005) (this Court "has consistently struck down administrative narrowing of clear statutory mandates") (quotation marks omitted).

EPA has elsewhere protested that changing the point of obligation yearly would be impractical. That mischaracterizes Petitioners' argument, which is that the agency has a statutory duty to *consider* the issue, particularly on this administrative record. EPA may not unilaterally convert what Congress made a "required element" of the annual rulemaking process into something "beyond the scope of th[e] rulemaking" simply by "not propos[ing] any changes to [it]" "[i]n the proposed rule." JA1030.[12]

Because EPA disregarded what the statute establishes as a "required element" of its duty when promulgating annual percentage standards, the Final Rule directly contravenes "the expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984). EPA's failure to obey the congressional mandate requires a remand for EPA to consider whether it remains "appropriate" to obligate refiners and importers, but not blenders. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (where "the intent of Congress is clear, that is the end of the matter" (quotation marks omitted)).

---

[12] EPA cannot argue that the point of obligation "was not at issue in [the underlying] rulemaking," *Monroe Energy*, 750 F.3d at 919, because here numerous Petitioners raised the issue in voluminous comments that were responsive to EPA's NPRM. In *Monroe Energy*, by contrast, petitioners had not argued for a change in the regulatory definition of "obligated party," and EPA had not exercised its statutory general waiver authority.

### B. EPA's disregard of the point of obligation is premised on an unreasonable interpretation of the statute.

Even if the statute were silent or ambiguous regarding consideration of which parties to obligate, treating that issue as categorically irrelevant to EPA's annual duty to set percentages would be unreasonable and contrary to the Act's purposes. *See Util. Air Regulatory Grp. ("UARG") v. EPA*, 134 S. Ct. 2427, 2442 (2014) ("Even under *Chevron*'s deferential framework, agencies must operate within the bounds of reasonable interpretation." (quotation marks omitted)).

First, such an interpretation is unreasonable in light of Congress's repeated emphasis on the importance of obligating the "appropriate" parties. Congress expressly commanded EPA not once but *twice* to obligate parties "as appropriate" when promulgating RFS Program regulations. *See* 42 U.S.C. § 7545(o)(2)(A)(iii)(I), 7545(o)(3)(B)(ii)(I). Congress first provided that "[i]n general" and "[r]egardless of the date of promulgation," RFS Program regulations "*shall* contain compliance provisions applicable to refineries, blenders, distributors, and importers, *as appropriate*, to ensure" that statutory volume requirements "are met." *Id.* § 7545(o)(2)(A)(iii)(I) (emphasis added). But Congress also provided that this same obligation occurs when setting *annual* percentage standards. *Id.* § 7545(o)(3)(B)(ii)(I).

Congress thus unmistakably emphasized obligating the "appropriate"

parties both for RFS Program regulations generally but also with respect to the required element of the annual percentage standards. This underscores EPA's continuing duty to obligate those parties best able to "ensure" that the statutory volumes "are met." *Id.* The word "appropriate"

> is the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors. Although this term leaves agencies with flexibility, an agency may not entirely fai[l] to consider an important aspect of the problem when deciding whether regulation is appropriate.

*Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quotation marks omitted); *see also Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 866-67 (D.C. Cir. 2000) (regulations must be consistent with Clean Air Act's purposes). EPA cannot satisfy its statutory duty when setting annual percentage standards without at least *considering* the appropriateness of the obligated parties.

The Court voiced similar concerns in *Michigan*, where it rejected EPA's interpretation that cost was irrelevant to deciding whether to regulate power plants under 42 U.S.C. § 7412(n)(1)(A), which requires the agency to "regulate electric utility steam generating units . . . if . . . such regulation is appropriate and necessary." Although EPA determined cost to be irrelevant only after extensively addressing comments arguing otherwise, the Court held that EPA's decision "strayed far beyond" legal bounds. *Michigan*, 135 S. Ct. at 2707. Here, EPA ignored a far plainer statutory com-

mand.[13]

Second, the fact that EPA confronted supply constraints triggering its general waiver authority in this rulemaking "should have alerted EPA that it had taken a wrong interpretive turn" in treating the appropriateness of the obligated parties as beyond the rulemaking's scope. *UARG*, 134 S. Ct. at 2446. Exercising its waiver authority required EPA to determine that there is an "inadequate domestic supply." 42 U.S.C. § 7545(o)(7)(A)(ii). This in turn required consideration of the "the full range of constraints" affecting supply. JA17. EPA generally claimed to take into account "*the ability of the standards we set to cause a market response and result in increases in the supply of renewable fuels*." JA31 (emphasis added).

In this context particularly, it was unreasonable for EPA to exclude from consideration how *its own* regulatory choice—obligating refiners and importers, but not blenders—affected the domestic supply it determined to be "inadequate." EPA admits that the only justification it has ever offered for the existing obligation point "is no longer valid," 75 Fed. Reg. at 14,722,

---

[13] Treating the point of obligation as beyond the scope of rulemakings setting annual percentage standards, moreover, creates tension with other RFS Program provisions. For example, "[i]n determining the applicable percentage for a calendar year," EPA "shall make adjustments . . . to prevent the imposition of redundant obligations on" obligated parties. 42 U.S.C. § 7545(o)(3)(C)(i). This requirement further illustrates the statutory structure's purposeful imposition—at multiple points—of EPA's duty to focus on obligating only appropriate parties.

and that unobligated blenders are "choos[ing]" behavior at odds with statutory objectives, *see* JA40-JA42. Allowing EPA to disregard systemic roadblocks of its own making frustrates the statute's purposes. And because "each additional supply increment is likely to be more difficult to achieve than the previous increments," unattended-to defects will only become *more* problematic over time. JA63.

Accordingly, EPA's view—that it may disregard the consequences of its own regulatory compliance provisions when purporting to consider how its annual standards will affect supply, JA31—is not entitled to *Chevron* deference.

### C. EPA's refusal to consider the compliance point is arbitrary and capricious.

EPA recognized that modifying the point of obligation could "improv[e] incentives provided by the RFS Program to overcome challenges that limit the potential for increased volumes of renewable fuels." JA13. Yet EPA refused even to consider comments on which parties are appropriately obligated, declaring those comments "beyond the scope of this rulemaking." *Id.* EPA's conclusory refusal to consider the point of obligation renders the Final Rule arbitrary and capricious. Thus, remand is also required under this standard of review.

1. *Petitioners' comments were not beyond the scope of the rulemaking.*

As detailed above in Sections A and B, the plain statutory language demonstrates that Petitioners' comments regarding the point of obligation were not "beyond the scope of th[e] rulemaking" as EPA professed, JA13, but instead involved a "required element" of EPA's determination, 42 U.S.C. § 7545(o)(3)(B)(ii).

Petitioners' comments also responded *directly* to considerations EPA identified in the NPRM. EPA sought recommendations that would allow it to increase renewable-fuel use over time while also accounting for "real-world limitations" that "have made the timeline laid out by Congress extremely difficult to achieve." JA103. Petitioners' comments answered that call.[14] *See supra* pp. 12-15.

[14] Another unaddressed agency-imposed constraint on supply was EPA's failure to establish gasoline-specific and diesel-specific standards, creating a "more difficult compliance pathway." JA578. Years ago, EPA acknowledged that creating a diesel-specific standard would "more readily align the RFS obligations," yet chose not to "unnecessarily complicate the program," despite comments that refiners were ill-equipped to blend fuels they do not produce. *See* Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 74 Fed. Reg. 24,904, 24,953 (May 26, 2009). In the present rulemaking, the Coalition identified EPA's refusal to address the disparate treatment of gasoline and diesel as an agency-imposed supply constraint. JA578. EPA ignored the Coalition's comment without even labeling the issue as "outside the scope" of the rulemaking. EPA's subsequent use of its waiver authority made it arbitrary and capricious to ignore this agency-imposed constraint.

EPA's characterization of these comments as beyond the scope—and its refusal to consider and respond to them—was thus arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (agency that "entirely failed to consider an important aspect of the problem" acts arbitrarily and capriciously). "One of the basic procedural requirements of administrative rulemaking is that an agency must . . . examine the relevant data and articulate a satisfactory explanation for its action." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation marks omitted).

In *Delaware Department of Natural Resources and Environmental Control v. EPA*, for example, EPA acted arbitrarily and capriciously by characterizing as "far afield" from its statutory responsibilities comments warning that a proposed rule governing use of certain power generators "threaten[ed] the efficiency and reliability of the energy markets" by forcing out traditional generators. 785 F.3d 1, 14-15 (D.C. Cir. 2015). This Court held that "EPA cannot get away so easily from its obligations . . . to respond to relevant and significant comments," emphasizing EPA's duty to "respond sufficiently to enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Id.* at 15 (quotation marks omitted). Here, EPA offered *no* explanation for characterizing the

point of obligation as beyond the scope and did not even provide the "wan responses to . . . comments" that this Court found inadequate in *Delaware*. *Id.* "[C]onclusory statements will not do; an agency's statement [explaining its action] must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotation marks omitted).

EPA also was required to respond to Petitioners' comments because their proposal, "if adopted, would [have] require[d] a change in [the] agency's proposed rule." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977). For example, EPA claims to have "finaliz[ed] volume requirements based . . . on the volumes that can be supplied in 2016 as the market addresses infrastructure and other constraints." JA5. If the misplaced point of obligation is *itself* a constraint on supply that *thwarts* infrastructure development, however, then EPA's utter disregard of that constraint renders its consideration of "infrastructure . . . constraints" incomplete. *Id.* Likewise, if Petitioners' comments are correct, then the obligation point in the Final Rule not only fails to "create incentives to increase renewable fuel supplies and overcome constraints in the market" as "Congress . . . clearly . . . intended," but actually entrenches *dis*incentives to increased renewable-fuel use. *Id.*

### 2. *EPA's refusal to consider the point of obligation is inconsistent with the Final Rule's rationale.*

EPA's refusal to consider or respond to Petitioners' comments regarding the compliance point is arbitrary and capricious because it is inconsistent with the Final Rule's rationale and "runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43. For example, EPA's analysis showed that leaving blenders unobligated has delayed necessary investment in renewable-fuel infrastructure. As EPA explained, blenders must "invest in new infrastructure to increase their capacity to blend and distribute renewable fuels" to facilitate sales growth. JA41. Naturally, blenders "must see sustained profit opportunities before they are *willing* to invest in new infrastructure." JA41 (emphasis added). Seeing no such opportunities, however, blenders have *chosen* not to make the necessary investments in infrastructure, leading EPA to conclude that "the RFS program . . . likely cannot substantially increase the available supply of renewable transportation fuels . . . to the volumes envisioned by Congress in the short term." JA41. EPA's recognition of this reality underscores the arbitrariness of its refusal to consider whether blenders should be obligated under the Final Rule to incentivize behavior necessary to achieve statutory objectives.

EPA also correctly acknowledged that because "the RIN is currently

an inefficient mechanism for reducing the price for higher level ethanol blends at retail," the RIN system is "unlikely to be able to significantly impact the supply of ethanol in the United States in 2016." JA39. Petitioners' comments explained, however, that the regulatory definition of "obligated party" is a root cause of the RIN system's inefficiency, because it allows unobligated blenders to profit from RINs rather than passing their value through to retail customers in the form of subsidized E85 prices. *See supra* pp. 13-15. EPA could not rationally ignore these comments—with which EPA essentially agreed, *see supra* pp. 16-17—while simultaneously purporting to address the constraints impeding growth in the renewable-fuel supply.

Moreover, EPA's refusal to consider the point of obligation is inconsistent with its waiver-related discussion in the Final Rule. For example,

> EPA agrees that its approach to interpreting the term "inadequate domestic supply" should be consistent with the objectives of the statute to grow renewable fuel use over time by placing appropriate pressure on all stakeholders to act within their spheres of influence to increase biofuel production and use of renewable fuels.

JA21. Having flatly refused even to consider whether current regulations obligate the appropriate parties, however, EPA could not have considered whether its regulations "plac[e] appropriate pressure on all stakeholders."

JA21.

Similarly, EPA concluded that the Final Rule's percentage standards reflect "the most likely maximum volume that can be made available under real world conditions." JA39. The corresponding need for the waiver exemplifies why ignoring Petitioners' comments—which demonstrated that the existing compliance point itself *impedes* increasing renewable-fuel use—guarantees future deficiencies, contrary to Congress's goals. The centrality of the point of obligation to the Final Rule should have been obvious to EPA, which declared in prior rulemakings that "alternative approaches" to the point of obligation would "more evenly align a party's access to RINs with that party's [renewable-fuel] obligations." 75 Fed. Reg. at 14,722; *see also API*, 706 F.3d at 480 (recognizing "asymmetry of incentives" inherent in the current compliance provision).

EPA's outright refusal even to consider this issue when exercising its general waiver authority was arbitrary and capricious. *See State Farm*, 463 U.S. at 48 ("[a]t the very least," agency should have addressed alternative proposal described in comments and provided "*adequate reasons*" for abandoning it) (emphasis added). EPA offered *no* explanation—much less a "reasoned explanation"—for refusing to examine the point of obligation in the Final Rule. EPA's "self-contradictory, wandering logic" "does not con-

stitute an adequate explanation of agency action." *See Delaware*, 785 F.3d at 16 (quotation marks omitted).

3. *EPA's refusal to consider the point of obligation is inconsistent with its prior findings and conclusions.*

In its 2010 Rule, EPA acknowledged that the "rationale . . . for placing the obligation on just the upstream refiners and importers is no longer valid" and admitted that "alternative approaches" would "more evenly align a party's access to RINs with that party's [RFS Program] obligations." 75 Fed. Reg. at 14,722. But after considering comments, the agency decided not to then change the point of obligation. EPA explained that it "continue[d] to believe that the market w[ould] provide opportunities for parties who are in need of RINs to acquire them from parties who have excess." *Id.* EPA assured interested stakeholders that it would "continue to evaluate the functionality of the RIN market" and pledged to "consider revisiting" the point of obligation if EPA "determine[d] that the RIN market is not operating as intended, driving up prices for obligated parties and fuel prices for consumers." *Id.*

By 2015, EPA had made such a determination. It acknowledged that the RIN market was no longer functioning as intended. JA39 ("[T]he RIN is currently an inefficient mechanism for reducing the price for higher level ethanol blends at retail, and therefore unlikely to be able to significantly

impact the supply of ethanol in the United States in 2016."). But to the dismay of all who relied on EPA's 2010 pledge, including Petitioners, EPA refused to consider revisiting the point of obligation and declared all comments on the issue "beyond the scope of the rulemaking."

EPA's sudden and unexplained abandonment of its earlier commitment to considering the point of obligation is arbitrary and capricious. *See Pac. Nw. Newspaper Guild v. NLRB*, 877 F.2d 998, 1003 (D.C. Cir. 1989) ("core concern" of arbitrary-and-capricious review is to prevent agency "ad hocery"). EPA responded to comments regarding the point of obligation in 2010 when the issue was less urgent because "compliance with the . . . total renewable volume requirements could be readily achieved." JA5. Now that statutory volume targets are unattainable and the RIN market clearly does not function as intended, EPA's refusal to reexamine an admittedly problematic point of obligation required *at least* the equivalent consideration and explanation. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (when "new policy rests upon factual findings that contradict" old policy's factual basis "or when its prior policy has engendered serious reliance interests," agency must provide "a more detailed justification" for changing course than would be required "for a new policy created on a blank slate"). Because EPA "has failed to provide even that minimal level of

analysis" and refused to consider a compliance point that, in its view, lacks a valid rationale, its failure to consider the point of obligation in the context of the Final Rule is arbitrary and capricious. *Encino Motorcars*, 136 S. Ct. at 2125; *see also Chem. Mfrs. Ass'n*, 217 F.3d at 867 (EPA may not "impose costly obligations on regulated entities without regard to the Clean Air Act's purpose"). Accordingly, remand is required.[15]

## CONCLUSION

EPA's explicit refusal to consider Petitioners' comments and to determine whether the requirements promulgated in the Final Rule are made applicable to the appropriate parties requires granting Petitioners' Petitions for Review and remanding for further consideration.

[15] This Court may remand for additional agency proceedings without vacating the rule during the interim. *E.g.*, *Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *White Stallion Energy Ctr., LLC v. EPA*, No. 12-1100, 2015 WL 11051103 (D.C. Cir. Dec. 15, 2015) (per curiam).

Respectfully submitted,

/s/ *Evan A. Young*
Evan A. Young
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
(512) 322-2506

Samara L. Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 953-6825

Shane Pennington
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
(713) 229-1340

Lisa M. Jaeger
Richard Alonso
BRACEWELL LLP
2001 M Street NW
Suite 900
Washington, DC
20006-3310
(202) 828-5800

*Counsel for Petitioner Valero Energy Corp.*

LeAnn M. Johnson
Albert Ferlo
Perkins Coie LLP
700 Thirteenth Street, N.W. Suite 600
Washington, DC 20005
(202) 654-6209

*Counsel for Petitioners Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Specialty Products Partners, L.P., Ergon-West Virginia, Inc., Hunt Refining Company, Lion Oil Company, Placid Refining Company, U.S. Oil & Refining Co., and Wyoming Refining Company*

Thomas J. Perrelli
David W. DeBruin
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6873

*Counsel for Petitioner Monroe Energy, LLC*

Richard S. Moskowitz
American Fuel & Petrochemical Manufacturers
1667 K Street, NW
Suite 700
Washington, DC 20006
(202) 552-8474

Thomas Allen Lorenzen
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC
20004-2595
(202) 624-2789

*Counsel for Petitioner American Fuel & Petrochemical Manufacturers*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's briefing order because this brief contains 6,643 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2010 in 14-point Georgia font.

/s/*Evan A. Young*
Evan A. Young

February 14, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2017, I caused copies of the foregoing document to be served by the Court's CM/ECF system, which will send a notice of the filing to all registered CM/ECF users.

/s/*Evan A. Young*
Evan A. Young

February 14, 2017